**O**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **HENRY SCHEIN, INC., HSI SERVICE CORP.**<br><br>           Plaintiff,<br><br>      v.<br><br>**CERTIFIED BUSINESS SUPPLY, INC., d/b/a PURITY MEDICAL PRODUCTS, INC.,**<br><br>           Defendant. | CASE NO. SA CV 03-1662 DOC (ANx)<br><br>**O R D E R GRANTING MOTION OF PLAINTIFF HENRY SCHEIN, INC., FOR CONTEMPT AGAINST DEFENDANT CERTIFIED BUSINESS SUPPLY, INC., FOR VIOLATING THE AGREED FINAL JUDGMENT AND PERMANENT INJUNCTION ENTERED BY THE COURT** |

_____

Before the Court is Plaintiff Henry Schein, Inc.'s ("Schein") Motion for Contempt Against Defendant Certified Business Supply, Inc., d/b/a Purity Medical Products, Inc. ("Purity") for Violating the Agreed Final Judgment and Permanent Injunction Entered by the Court ("Motion"). After considering the moving, opposing, and replying papers, as well as witness testimony and oral argument, the Court hereby GRANTS Schein's Motion.[1]

---

[1] As a preliminary matter, the parties make a number of objections to evidence submitted in conjunction with the Motion. To the extent the Court relies on such

## I. BACKGROUND

### A. The Original Action

Schein is a seller and distributor of healthcare products and services to office-based practitioners in the United States. At the time the Injunction went into effect, HSI Service Corp. ("HSI") was a wholly owned subsidiary of Schein and the owner of the trademarks at issue. HSI has since merged with Schein. Purity is a competitor of Schein and a nationwide distributor of medical and pharmaceutical products.

On November 21, 2003, Schein filed an action against Purity, alleging that Purity had contacted customers of Schein claiming to be affiliated with Schein, and misled customers of Schein in order to urge those customers to purchase products from Purity at inflated prices. Schein's Complaint alleged that this conduct had infringed Schein's trademark, deprived Schein of sales and profits, and jeopardized Schein's goodwill. Purity agreed to be bound by a stipulated judgment. On May 5, 2004, The Honorable Gary L. Taylor rendered, and caused to be entered, an Agreed Final Judgment and Permanent Injunction ("Injunction") containing prohibitory injunctive relief directed to and binding upon Purity.

Under the terms of the Injunction, Purity is enjoined from engaging in the following acts or practices:

> A. Directly or indirectly using, without authorization, HSI's marks, trade names, or any marks confusingly similar thereto or claiming to represent or otherwise be associated with HSI or HSI's marks under any circumstances.
>
> B. Committing any acts that may cause purchasers to believe that the Purity Parties are in any way affiliated or associated with HSI or any of its affiliates, subsidiaries, parents and their respective past, present or future officers, directors, agents, representatives, servants and employees.

---

evidence in this Order, these objections are OVERRULED.

    C.  Directly or indirectly forming or causing to be formed any corporation, partnership, or other business entity that engages in any of the conduct proscribed by the paragraphs above.

    D.  Attempting, causing or assisting any of the above-described acts.
(Injunction).

### B. Motion for Contempt

In the instant Motion, Schein alleges that, since at least June 2006, Purity has committed the following violations of the Injunction:

    1. Purity representatives contacted Henry Schein's customers and falsely informed them that they could no longer order certain dental supplies through Henry Schein's website, and that the orders would have to be placed through the "warehouse" through Purity's representative.  Purity's representatives did not disclose that Purity had no affiliation with Henry Schein.  To the contrary, they led customers to believe that the caller was from Henry Schein, and then did not correct the customers' incorrect assumption Purity was associated with Henry Schein.

    2. Purity representatives contacted Henry Schein's customers and falsely claimed to be from the "Henry Schein Manufacturing Center."  Purity representatives then informed the customers that the particular type of needles the customers normally ordered from Henry Schein would not be available until much later, and recommended that the customers buy those needles through Purity, at much higher prices.

    3. Purity representatives contacted Henry Schein's customers and falsely claimed that the customer had been referred to Purity by "Henry Schein."  The Purity representatives then claimed that because Henry Schein no longer supplied the type of needles the

          customers normally ordered from Henry Schein, the customers
          would have to buy them from Purity, at much higher prices.

(Plaintiff's Motion).

Schein requests that the Court hold Purity in contempt of Court, order Purity to pay sanctions to Schein to compensate Schein, and to coerce Purity into complying with the injunctions in the future.

### C. Factual Findings

After reviewing the parties' papers, observing testimony, and judging credibility, the Court makes its factual findings, set forth below, relevant to violations of the injunction.

#### 1. Specific Incidents Relating to Third-Party Purchasers

##### a. Midtown Dental

Caitlin Clenney ("Clenney") was previously employed at Midtown Dental ("Midtown") in Florida. Clenney was responsible for ordering dental supplies for Midtown. She primarily ordered these supplies from Schein. On November 12, 2007, after being employed by Schein for approximately five months, Clenney received a phone call from an individual who stated he was from the Henry Schein Manufacturing Center. Clenney believed the person to be from Schein based on his representations. The individual stated that Schein was going to be out of needles from November through March and recommended that Clenney place an order at the time. Clenney placed an order for two half cases of needles.

Two weeks after placing the order, Clenney received an invoice dated November 14, 2007 for dental needles from Purity. (Exhibit 2). The invoice is clearly identified as originating from Purity. It indicates that the seller was "Luise." Clenney had never heard of Purity. Clenney either called Purity, or Purity called Clenney to verify the order. Clenney spoke to an individual identified as "Bill"[2] and indicated her wish to cancel the order. During the conversation, Clenney told Bill that the Purity representative had initially represented that he

---

[2] During the proceedings, Purity witnesses admitted to the use of false names during phone conversation. For this reason, several of the names are initially identified in quotations.

1   was from the Henry Schein Manufacturing Center. Bill proceeded to yell at Clenney, calling her
2   a "liar."
3         Midtown's office manager, Phyllis Burke ("Burke") subsequently spoke to Bill. Burke
4   informed Bill that his behavior was unacceptable. Burke also spoke to a manager identified as
5   "Trent" who indicated that he would speak to Bill's supervisor regarding Bill's attitude.
6   Midtown received no further products or invoices from Purity, and no payments were made to
7   Purity. The order was canceled. Testimony during the hearings indicated that the individual
8   identified as "Bill" was actually Harold Newry ("Newry"), a customer service manager at Purity.
9         Clenney also contacted a Schein representative regarding the incident, and lawyers
10  contacted Clenney so she could make an affidavit.
11        The prices charged by Purity for the boxes of needles were grossly overinflated. Purity
12  charged approximately $47 per box. Schein had been charging approximately $10 or less for the
13  same boxes of needles.

### b.   Lakewood Dental

15  Bonnie Packer ("Packer") is an assistant at Lakewood Dental ("Lakewood"), located in
16  Rochester, Minnesota. One of Packer's job functions is to order dental supplies, which
17  Lakewood has ordered from Schein in recent years. On June 5, 2006, Packer was contacted by
18  an individual selling dental supplies. Packer believed that individual to be from Schein. The
19  individual told Packer that Lakewood would have to order supplies directly from the warehouse,
20  rather than online as Lakewood had done previously when ordering from Schein. The individual
21  further informed Packer that she would have to order the dental supplies by the case. Lakewood
22  had not typically ordered by case in the past, instead ordering by boxes. There are
23  approximately five boxes per case. Packer placed an order with the individual. An invoice with
24  a date of June 13, 2008, was issued to indicate this order. (Exhibit 11). The invoice shows that
25  it was sold by "LUISE."
26        Packer subsequently placed a replacement order for a different type of needle after Packer
27  realized that she had previously ordered the wrong size. An invoice dated July 14, 2008 was
28  issued regarding this order. (Exhibit 12). The invoice indicates that the item was "Sold By

1  HOUSE." This notation means that the call was initiated by Packer, the customer. The order
2  was handled by Keith Morgan ("Morgan"), the sales manager for Purity.

3  At some point after the products had been received, Summit Dental, Lakewood's owner,
4  noticed that the invoice for the order was from Purity. Summit informed Packer that Purity was
5  not affiliated with Schein. Tami Dressel from Summit then contacted Purity, which refused to
6  allow the products to be returned due to the expiration of the 30 day return policy. The products
7  had been received on day 29 of the 30 days allowed in the return policy. No further orders were
8  placed with Purity. Packer had no further contact with anyone from Purity. However, Howie
9  Burns ("Burns") of Purity sent a Legal Demand Letter on September 8, 2006, for the outstanding
10 balances and threatened collection efforts including "the use of late fees, collection agencies,
11 attorneys, and any lawsuits." (Exhibit 14).

12 The prices charged by Purity on the invoices were substantially inflated. Purity charged
13 Lakewood approximately 47 dollars per box. For the same needles, Schein charged
14 approximately 8 dollars per box.

15                 **c.     Ken Martin & Associates**

16 Dora Martin ("Martin") is employed as the head dental assistant at Ken Martin &
17 Associates ("KMA"). Martin has been employed by KMA since 2003. One of her primary
18 responsibilities is ordering supplies for KMA. Typically, Martin makes these purchases through
19 an Internet account with Schein. For approximately the last three years, Martin has ordered
20 supplies from Schein.

21 In April 2007, Martin was contacted by an individual identified as "Bill" or "Keith," who
22 told her Schein would no longer carry 30 gauge hub needles and that Purity would be KMA's
23 new supplier. Martin believed that Purity was affiliated with Schein based on this phone call
24 and that Purity was taking over from Schein with Schein's authorization. Martin told the
25 individual that she had just ordered from Schein. At the time, Martin indicated that the current
26 inventory was sufficient for KMA's needs, but that she would call back with any future orders.
27 On or around July 2, 2007, Martin determined that KMA needed more Monojet needles.
28 Martin called Purity back, believing that Purity was Schein's new supplier. She spoke to

1  "Keith" and placed an order for two cases of Monojet needles.  An invoice was subsequently
2  received indicating that KMA had purchased needles sold by "Keith."  (Exhibit 4).  Louise Lind
3  ("Lind"), a sales representative for Purity, indicated that she is the only one who makes cold
4  calls for dental supplies.  As such, she did not know why this invoice indicated that it was sold
5  by "Keith."  Morgan indicated that this would likely mean that it was a re-order, although there
6  is no evidence indicating which prior order had been made by KMA.

7  In September, Martin received a call from Keith, asking whether she needed more
8  Monojet needles. Martin explained that KMA did not need any more Monojet needles.  Keith
9  indicated that KMA was scheduled for auto shipment and that the account could no longer be
10 kept on hold.  He indicated that KMA would be penalized if they did not place an order.  Keith
11 indicated that Purity carried other dental supplies, such as cups and bibs.  Martin was concerned
12 that she would not be able to order needles in the future if she did not purchase any supplies at
13 the time.  As a result, she ordered cups and bibs.  She received an invoice dated September 6,
14 2007, indicating that the cups and bibs were sold by "Keith."  (Exhibit 6).

15 Dr. Kenneth Martin reviewed the invoice and expressed his concern about the grossly
16 overinflated price of the products.  On or about October 10, 2007, Martin called Purity and
17 spoke to "Bill" regarding the price for the bibs and cups.  In response, Bill explained, "that is our
18 prices."  Bill subsequently offered to give a 50% discount on the order of bibs and cups.  Bill
19 explained that, if KMA paid in full, the account would be closed.  An updated invoice dated
20 September 6, 2007 was sent to reflect the discount (Exhibit 8).

21 After these experiences, Martin called Andrew Guenther ("Guenther"), KMA's sales
22 representative at Schein, to inform him of the experiences.  Guenther informed Martin that
23 Purity was not affiliated with Schein, and that Schein still supplied Monojet needles and other
24 dental products.

25 Martin and Newry spoke on the phone on multiple occasions.  In response to KMA's
26 complaints, Newry arranged for KMA to return the products.  Purity has not yet received the
27 products from KMA.

28 The prices charged on the products that Purity attempted to sell to KMA were similarly

7

1  overinflated as those prices charged to the other dentists' offices.

2    **2. Purity's Structure and Procedures**

3    During the hearings, several Purity employees spoke regarding Purity's business
4  structures and certain procedures in place at Purity.

5    **a. Harold Newry**

6    Harold Newry ("Newry") is a customer service manager at Purity, and is also responsible
7  for verification of orders. An individual named Mark Lyons, who uses the invented name
8  "Wayne," shares the verification responsibilities with Newry. Newry has worked at Purity for
9  nearly 12 years. When making calls on behalf of Purity, Newry uses either the invented name
10 "Bill Scott" or "Howie Burns." Newry also uses names other than his own name when
11 executing documents, and he will frequently sign a false name on collection letters that he
12 issues.

13   Newry is not directly involved in making sales calls or training employees. He claims to
14 have never advised anyone that Purity is associated with Schein. He further claims to have no
15 knowledge of anyone within Purity making such representations. When Newry speaks to
16 consumers, he has no documentation indicating which individual that consumer had previously
17 spoken to within Purity. He does not sit in the front room and does not listen to the initial sales
18 cold calls.

19   Newry's role in the process occurs after the initial sales contact made by a salesperson in
20 the front room. After a salesperson makes a sale, Newry verifies the sale on two occasions: 24
21 hours after the sale, as well as 10 days later to make sure that the invoice has been received. If
22 consumers indicate that they have changed their mind, the order is canceled. Purity uses the
23 same invoice every time, and that invoice indicates that Purity is an independent entity.
24 Although the initial sales calls are not taped, the verification calls are recorded.

25   Newry indicated that Purity has other major competitors besides Schein. In addition,
26 Newry was not aware of any other injunctions or governmental order against Schein.

27   **b. Keith Morgan**

28   Morgan is a sales manager for Purity. He is responsible for hiring, training, and firing

1  sales representatives, supplying leads, and closing all sales deals.  Morgan does not make cold
2  calls himself.  He tells the sales representatives what to say on the phone and can overhear their
3  conversations.  Morgan is unable to listen to all of these conversations, all of the time, because
4  he sometimes takes breaks, and there are multiple conversations occurring at any given time.  At
5  most, six sales representatives are in the room at a time.  Each sales representative connects on
6  approximately 100 calls per day.  Morgan is capable of hearing both sides of the conversation on
7  any particular sales call, although this fact is not disclosed to the customers.  He is available to
8  provide help, if the sales representatives need assistance, and he makes sure that they stay true to
9  Purity's pitch.  Although a script is purportedly used during the sales calls, Purity failed to
10 present the script to the Court.

11 Morgan was made aware of the underlying injunction in this action around spring of
12 2004.  The CEO of Purity spoke with Morgan and told him to tell people to end phone calls if
13 the word "Schein" was spoken.  Morgan subsequently conveyed this information to the rest of
14 the sales team.  He further explained that violation of the injunction could lead to a lawsuit or a
15 fine.  There are new employees at Purity that were not yet present when Morgan conveyed this
16 information.  However, Morgan states that he provided this information in a document that was
17 handed to everyone.  This document was not presented to the Court.

18 Morgan indicated that Lind is the only one who makes the initial dental related sales calls.
19 Morgan may handle a call if the consumer has previously ordered from Purity.  Newry
20 subsequently handles the verification for both the new orders and re-orders.

21        **c.**    **Louise Lind**

22 Lind is one of nine total sales representatives for Purity.  She is identified by the notation
23 "Luise" on sales invoices.  Lind never uses pseudonyms on the phone while making sales calls.
24 Lind has been employed by Purity for approximately eight years.  She claims to be the only
25 employee at Purity who makes the initial cold calls to sell dental needles.

26 Lind follows a similar process for every sales call.  She receives a lead from Morgan, her
27 sales manager, which includes the name of a company and its phone number.  Lind receives no
28 information about suppliers from whom the company may have purchased in the past.  Lind

1  follows a script during her phone calls, and she claims to have never personally represented an
2  association with Schein.  These phone calls are made while she is in the room with other
3  salespeople and Morgan.  Morgan sits one seat away during the phone calls and can hear Lind's
4  conversations if he tunes in to them.  Lind indicated that there are typically approximately five
5  salespeople in the room at a given time.  Lind makes approximately 500 cold calls in one day.
6  The cold calls are not recorded.  Once Lind completes her end of a sale, the call transfers to
7  Morgan to close the sale.
8       Lind is compensated on commission based on the number of sales that are verified.  Thus,
9  the sale is not final at the conclusion of Lind's phone call, and Lind is not compensated for that
10 call until it is confirmed by other staff members.
11      Lind is aware of the existing injunction with Schein, as Morgan told her and the rest of
12 the salespeople of its existence.  As a result, her understanding has been to not use the Schein
13 name in any way.  Lind was told that she would be automatically terminated if she violated the
14 injunction.  This conversation occurred on one occasion, and Lind does not recall receiving
15 anything in writing regarding the injunction.

16 **II.     LEGAL STANDARD**

17      Civil contempt occurs when a party disobeys a specific and definite court order by failing
18 to take all reasonable steps within its power to comply.  *In re Dual-Deck Video Cassette*
19 *Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993).  Although there is no good faith
20 exception that would excuse compliance with a court order, a party should not be held in
21 contempt if its action "appears to be based on a good faith and reasonable interpretation of the
22 [court's order]."  *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d at 695
23 (quoting *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir. 1982)).
24 The party alleging civil contempt must establish "by clear and convincing evidence" that the
25 opposing party (1) violated a court order, (2) beyond substantial compliance, and (3) the
26 violation was not based on a good faith and reasonable interpretation of the order.  *In re Dual-*
27 *Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d at 695; *Vertex Distrib., Inc.*, 689 F.2d at
28 889.  The purpose of civil contempt is to coerce compliance with a court order or to compensate

another party for the harm caused by the contemnor. *Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 443, 106 S. Ct. 3019 (1986). In determining the amount of a civil contempt sanction, the Court should consider: (1) the harm from noncompliance; (2) the probable effectiveness of the sanction; and (3) the burden the sanctions may impose on the contemnor's financial resources. *United States v. United Mine Workers*, 330 U.S. 258, 303-04, 67 S. Ct. 677 (1947).

### III. DISCUSSION

#### A. Civil Contempt

Through live witness testimony and affidavits submitted to the Court, Schein has met its burden of showing "by clear and convincing evidence" that Purity (1) violated a court order, (2) beyond substantial compliance, and (3) the violation was not based on a good faith and reasonable interpretation of the order. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d at 695.

The Injunction clearly sets forth conduct that is proscribed. That conduct includes "claiming to represent or otherwise be associated with HSI or HSI's marks under any circumstances." It also includes "[c]ommitting any acts that may cause purchasers to believe that the Purity Parties are in any way affiliated or associated with HSI or any of its affiliates, subsidiaries, parents and their respective past, present or future officers, directors, agents, representatives, servants and employees." The conduct that has been proven in this case directly and clearly violates the plain language of the injunction.

Schein has successfully set forth evidence to prove multiple instances of direct violations by clear and convincing evidence. Schein has done so through the testimony of third-party purchasers who would have no incentive to lie on Schein's behalf. The Court finds the most clear violations of the injunction to have occurred with respect to Midtown and KMA. An individual from Purity called Midtown and represented himself to be from the Henry Schein Manufacturing Center. This caused Clenney to believe that the person was from Schein. In addition, the individual falsely stated that Schein would be out of needles from November through March in order to coerce KMA to purchase from Purity. These acts directly violated the

1  Injunction; the individual claimed to be from Schein and made statements that caused Clenney, a
2  purchaser, to believe that the caller was affiliated with Schein.
3        KMA was similarly duped by Purity.  Again, an individual from Purity called KMA.
4  This time, the individual indicated that Schein would no longer carry 30 gauge hub needles and
5  that Purity would be the new supplier.  This information was patently false.  In addition, such a
6  statement would and did naturally lead the purchaser, Martin, to believe that the caller was
7  affiliated with Schein and was calling with Schein's permission.  As a result, Martin was coerced
8  into ordering from Purity.  Again, these acts constitute the very conduct that is explicitly
9  prohibited by the Injunction.
10        The Court finds the evidence related to Lakewood to be less straightforward.
11  Inconsistencies between Packer's testimony and her affidavit make it difficult to determine
12  Purity's precise conduct with respect to the initial phone call.  Although Packer believed that the
13  individual was from Schein, it is less clear how much of this impression resulted from Purity's
14  conduct in violation of the Injunction.  Nonetheless, the circumstances surrounding Purity's call
15  to Lakewood are suspicious.  There was no prior relationship between Purity and Lakewood.
16  Thus, Purity's representation that Lakewood would no longer be able to order from the website
17  and would instead have to order directly from the warehouse is misleading, at best.  Regardless
18  of whether this conduct constituted a direct violation of the Injunction, the circumstances
19  surrounding KMA and Midtown are sufficient to show that Purity violated a court order.
20        In addition, there are additional circumstances that make the violations of the Injunction
21  particularly egregious.  The prices charged by Purity to these entities were inflated by a factor of
22  400-500%.  By coercing the entities to purchase supplies, then charging wholly unreasonable
23  prices, Purity has shown great disregard for the Injunction.  In addition, when confronted about
24  the questionable conduct, Newry yelled at Clenney and called her a liar.  Finally, Purity
25  delivered items to Lakewood on the 29th day of the 30 day return policy, then refused to accept
26  the return and tried to collect on the bill by threatening legal action.  Not only has Purity violated
27  the injunction, it has also engaged in disreputable conduct.
28        Furthermore, the nature of the violations shows that Purity failed to substantially comply

1  with the Injunction. As explained by the Ninth Circuit, "[s]ubstantial compliance with the court
2  order is a defense to civil contempt, and is not vitiated by a few technical violations where every
3  reasonable effort has been made to comply." *In re Dual-Deck Video Cassette Recorder Antitrust*
4  *Litig.*, 10 F.3d at 696. Here, the violations are not technical. Instead, they show a clear failure to
5  comply with the explicit terms of the Injunction. Furthermore, the Injunction proscribes any
6  misrepresentations or misleading acts to indicate an affiliation with Schein. Here, there are
7  multiple instances of violations. Under such circumstances, Purity cannot claim substantial
8  compliance. The Injunction does not permit sporadic violations, where those violations go to the
9  heart of the Injunction.

10  There are many reasonable efforts that Purity could have taken to comply, but failed to
11  take. For example, rather than simply giving one speech to the employees regarding the
12  Injunction, Purity could have posted information on the wall for all new employees to view.
13  Purity could have also included a large warning in the script that termination would result from
14  any mention of Schein. In addition, Purity could have exercised better supervisory power of its
15  employees. Although Purity records all verification calls, none of the cold calls are recorded.
16  Furthermore, Morgan is unable to listen to five calls at a time. Purity cannot now hide behind
17  actions taken by its agents. Purity is responsible for all of its employees' conduct, and it should
18  make sure that methods are firmly in place to prevent further violations from occurring.

19  Purity claims that all of its cold calls are based on a standard script. However, instead of
20  presenting that evidence to the Court, Purity has focused on the procedures that occur after the
21  initial cold call. The violations occurred during the initial cold call, but Purity presented very
22  little evidence to the Court regarding what happens during a cold call. The Court is left to
23  wonder what the script says and why the script was not presented to the Court. In sum, these
24  circumstances fail to show substantial compliance with the Injunction, particularly in light of
25  multiple direct violations of the Injunction.

26  Finally, the violations are not based on a good faith and reasonable interpretation of the
27  Injunction. The violations are contrary to the plain language of the Injunction. No reasonable
28  interpretation of the Injunction would lead to the conclusion that the conduct was permitted.

For these reasons, the Court finds that Purity has committed civil contempt.

**B.     Sanctions**

In a civil contempt proceeding such as this, the Court is limited to compensating Schein for the harm engendered by Purity's misconduct and attempting to coerce compliance with its order.  *See Portland Feminist Women's Health Center v. Advocates for Life, Inc.*, 877 F.2d 787, 790 (9th Cir. 1989) (definition of civil contempt is that which is issued, "to compensate for the costs of the contemptuous conduct or to coerce future compliance with the court's order. . . ."). Attorneys' fees are properly awarded as a sanction for contempt.  *See In re Dyer*, 322 F.3d 1178, 1195 (9th Cir. 2003).  Costs are also appropriate.  *See Perry v. O'Donnell*, 759 F.2d 702, 705-06 (9th Cir. 1985).  In determining the amount of a civil contempt sanction, the Court should consider: (1) the harm from noncompliance; (2) the probable effectiveness of the sanction; and (3) the burden the sanctions may impose on the contemnor's financial resources.  *United States v. United Mine Workers*, 330 U.S. 258, 303-04, 67 S. Ct. 677 (1947).

Schein requests its attorneys' fees associated with bringing the Motion in order to coerce Purity to comply with the Injunction.  In support of the Motion, Schein's counsel submitted declarations for a total of $25,940.00 in attorneys' fees.  However, these declarations did not include the attorneys' fees or costs associated with the hearings on the Motion.  On top of the additional attorneys' fees, the reasonable costs will minimally include the cost of flying the witnesses to the hearings and other related expenses.  Schein's counsel requested the opportunity to submit updated declarations if the Court found the requested sanction to be appropriate.

The Court finds the harm from noncompliance of the Injunction to be substantial. Purity's violations of the Injunction have adverse effects on Schein.  First, they divert business from Schein.  In addition, they may have a negative adverse effect on Schein's reputation with its long-term purchasers.  Most importantly, Purity's conduct harms the consumers of the products.  By coercing consumers to purchase Purity products, bilking consumers with exorbitant prices, and treating the purchasers poorly during the follow-up conversations, Purity has caused tremendous harm and distress to these purchasers.

In order for the sanction to be effective and make Purity realize the importance of

compliance, it must be more than a nominal sanction. The Court finds it important to send a clear message that any noncompliance with the Injunction will not be profitable. In addition, it is important that Purity realize the substantial legal expenses Schein has incurred in order to enforce the Injunction. Finally, Purity is a company of moderate size, and there is no indication that the proposed sanction would have a crippling effect on Purity's financial resources.

For these reasons, the Court finds that reasonable attorneys' fees and costs are the appropriate sanction for Purity's civil contempt. The Court will determine the reasonable amount of attorneys' fees and costs to impose based on supplemental declarations to be submitted by Schein's counsel no later than September 19, 2008.

## IV. DISPOSITION

For the above-mentioned reasons, Plaintiff Henry Schein, Inc.'s Motion for Contempt Against Defendant Certified Business Supply, Inc., d/b/a Purity Medical Products, Inc. for Violating the Agreed Final Judgment and Permanent Injunction Entered by the Court is hereby GRANTED. The Court finds that Purity has committed civil contempt by violating the express terms of the Injunction.

The Court will impose a sanction equivalent to the reasonable attorneys' fees and costs incurred by Plaintiff related to this Motion. Plaintiff's counsel is directed to submit a supplemental filing, including declarations, setting forth the attorneys' fees and costs incurred by Plaintiff. These papers shall be submitted no later than Friday, September 19, 2008. Upon receiving these filings, the Court will determine what amount of fees and costs is reasonable.

IT IS SO ORDERED.

DATED: August 20, 2008

_____
DAVID O. CARTER
United States District Judge